**Alonzo CRAWFORD, Plaintiff,**

v.

**CHARLOTTE–MECKLENBURG BOARD OF EDUCATION, Defendant.**

No. C–C–85–109–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Aug. 8, 1986.

---

**572**

Alonzo Crawford, Charlotte, N.C., pro se.

John J. Doyle, Jr., Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Complaint filed by the Plaintiff, Alonzo Crawford ("Crawford"), against the Defendant, Charlotte-Mecklenburg Board of Education ("Board"), in which Crawford alleges that he was subjected to discriminatory practices and discipline in his employment and that he was constructively discharged because of his race and sex.

The trial was heard before the undersigned without a jury on July 24, 1986, in Charlotte, North Carolina. Crawford proceeded *pro se;* the Board was represented by Attorney John J. Doyle, Jr. After a full trial of the matter, the Court, having carefully considered the testimony and exhibits, enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

(1) This action was brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

(2) The Plaintiff, Alonzo Crawford, is a black male who resides in Mecklenburg County, North Carolina.

(3) The Defendant, Charlotte-Mecklenburg Board of Education, is a corporate body responsible for operating the public school system in Mecklenburg County, North Carolina.

(4) Crawford worked for the Board as a teacher's aid from October 27, 1980 to April 24, 1984. Crawford was first employed at Idlewild Elementary School from October 1980 through February 5, 1981, when he was transferred to Oaklawn Elementary School where he worked as an aid through the remainder of the 1981 school year. On August 24, 1981, Crawford was assigned to the position of K–3 Aid at Chantilly Elementary School for the 1981–82 school year. Crawford remained employed with the Board at Chantilly Elementary School for the next two years until he eventually resigned on April 24, 1984.

(5) While at Idlewild Elementary, Crawford served as an aid to Barbara White, a second grade teacher. White and Crawford had a conflict about whether Crawford did a sufficient job regarding the class instructional program and Crawford's poor supervision performance. White took her concern to Charles Yates, the principal of Idlewild Elementary at that time. Upon Yates' conference with Crawford, Crawford stated that White had communicated that if it was up to her, Crawford would not work in the Mecklenburg County

Schools. Crawford further stated to Yates that he did not get along with White.

(6) As a result of Crawford's conflict with White, Yates transferred him to Oaklawn Elementary on February 5, 1981. This alternative seemed more appropriate to Yates than terminating Crawford since Yates felt Crawford could offer a contribution to the school system as a teacher's aid.

(7) Crawford remained employed at Oaklawn for the remainder of the 1981 school year and received a satisfactory evaluation while there.

(8) Crawford began working at Chantilly Elementary in August of 1981. For the next three school years, Crawford worked as an aid to Frances Akers, a first grade teacher.

(9) During the second half of the 1983–84 school year, problems developed with Crawford's performance. Akers complained to principal Earl Owens that Crawford was repeatedly absent from the classroom during the busiest part of the school day, 9:30 a.m. until 11:00 a.m. and that Crawford had been departing early from school after the students had gone but before the staff was scheduled to leave.

(10) On March 1, Owens held a meeting with Crawford and Akers to discuss these problems during which Owens reminded Crawford of his responsibility to be in the classroom when he was needed and not to leave the school grounds until after 3:00 p.m.

(11) Prior to the March 1, 1984 meeting, Akers stated to Crawford in front of students in the classroom that she was going to report him for going to the bathroom and that she wished he could get a job somewhere else where he would be happier. This statement upset and embarassed Crawford.

(12) On March 9, 1984, Owens received another complaint about Crawford, this one from Sharon Frazier, the school music teacher. Frazier reported that while she was using the telephone in the school health room, Crawford had approached her and had made a sexual advance. Crawford had asked Frazier to go with him to the rear of the health room where there was a bed. Shortly afterwards, however, Crawford repeatedly apologized, explaining to Frazier that his head was not "working right."

(13) Frazier later reported the incident to Owens, and upon his request, she prepared a written statement summarizing the incident.

(14) On March 12, 1984, the next school day, Owens held a meeting with Frazier and Crawford. In a written statement Crawford prepared and in the course of that meeting, Crawford admitted to making an inappropriate sexual remark to Frazier, but explained that a voice in his head had directed him to do it, that he was in a semi-conscious dream, that he was not in control, and that immediately after speaking to Frazier, he felt something in his mind snap like a rubberband bringing him back to reality.

(15) Owens reminded Crawford of previous complaints concerning Crawford's practice of staring at female teachers in a sexual manner. Owens directed Crawford to cease attending the music class which Frazier taught, to improve his performance as a teacher's aid and to immediately seek help to deal with his problem of sexual harassment of female employees.

(16) On the same date, Owens referred Crawford to the school system's employee assistance office for professional help. Subsequently, Crawford scheduled an appointment with Dr. Gordon H. Rettke, the program's coordinator.

(17) It is the practice of the employee assistance office to inform the referring supervisor of the employee's cooperation with the recommended program of assistance. Accordingly, on March 16, 1984, Rettke informed Owens that Crawford had agreed to follow the recommended program of assistance.

(18) Only three days later, however, Rettke reported to Owens that Crawford was not cooperating. Rettke had referred Crawford to a licensed psychiatrist, Dr.

William Christopher, for evaluation as a candidate for psychoactive medication. Crawford made one visit to Christopher but refused to undergo a program of treatment which required medication.

(19) On March 29, 1984, Rettke informed Owens that Crawford continued to be uncooperative and declined further help from the employee's assistance program.

(20) Following his conference with Owens on March 12, 1984, Crawford continued to remain on sick leave. On April 6, 1984, Crawford met with Dr. Joseph C. Flora, assistant superintendent for personnel services with the Board, during which Crawford discussed his history as a teacher's aid and his mental problems with respect to the sexual harassment of Frazier.

(21) Flora suspended Crawford without pay effective April 5, 1984 and required him to undergo a complete psychiatric examination to determine his ability to resume his position as a teacher's aid. Flora required that the Plaintiff submit a written report of the psychiatric evaluation to the personnel office within 30 days and Flora reserved the right to request a psychiatrist of the school system's choosing to evaluate Crawford if a second opinion was deemed necessary. Flora advised Crawford that his failure to undergo either evaluation could result in his dismissal.

(22) Crawford failed, however, to undergo the required psychiatric evaluation and he made no further contact with school officials until April 24, 1984, when he submitted his resignation. The Board accepted his resignation on April 27, 1984. Crawford conceded at trial that he decided to resign rather than undergo the psychiatric evaluation which had been required.

(23) Crawford filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") shortly after his resignation. The EEOC investigated his charges of racial and sexual discrimination and on July 15, 1985, issued a termination letter in which it concluded there was no reasonable cause to support Crawford's allegations.

(24) This Court finds as a fact that the evidence presented at trial did not show that Crawford was disciplined, constructively discharged or otherwise subjected to disparate treatment on account of his race or sex. Crawford was disciplined because he made a sexual advance toward Frazier and obviously experienced mental problems in that respect. Crawford was repeatedly absent from class during the busiest hours of the school day, he left school early, could not get along with his superiors, made sexual stares towards female teachers and admitted to hearing voices in his head directing him to conduct himself in an offensive manner. The Board's explanations for requiring Crawford to undergo psychiatric evaluation are both credible and nonpretextual. Indeed, since Crawford's transfer from Idlewild Elementary in 1981, the Board generously worked with Crawford to develop his potential and improve job effectiveness. The evidence presented simply does not show racial or sexual discrimination.

(25) Any finding of fact which is deemed a conclusion of law is so deemed and any conclusion of law which is deemed a finding of fact will be so deemed.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343.

(2) The Board is subject to the jurisdiction of this Court and is an "employer" as defined by 42 U.S.C. § 2000e(b).

(3) Title VII prohibits discrimination in employment because of an employee's race or sex. 42 U.S.C. § 2000e–2(a). In a private, non-class-action complaint under Title VII charging employment discrimination, the order and allocation of proof are set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The three steps required for a claimant to prove are: (1) the claimant must prove by the preponderance of the evidence a *prima facie* case of discrimina-

tion; (2) if the claimant has proven the *prima facie* case the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision; and (3) once the employer articulates the reason, the claimant then has the burden to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were but a pretext for discrimination. *Burdine, supra,* at 253, 101 S.Ct. at 1093–94.

(4) To establish a *prima facie* case of discrimination, the claimant must show that (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) despite his qualifications he was discriminated against; and (4) the employer replaced the claimant with a person of equal qualifications. *Smith v. University of North Carolina,* 632 F.2d 316 (4th Cir. 1980). The claimant must prove

> actions taken by an employer from which one can infer, if such actions remain unexplained, that is more likely than not that such actions were "based on discriminatory criterion under the Act."

*Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

(6) The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the claimant remains at all times with the claimant. *Texas Department of Community Affairs v. Burdine, supra* 450 U.S. at 253, 101 S.Ct. at 1093–94.

(7) The trier of fact, in a Title VII case, may rely on inference rather than direct evidence of intentional discrimination, but discriminatory intent must be proved by a preponderance of the evidence, whether direct, circumstancial, or otherwise. *Texas Department of Community Affairs v. Burdine, supra; Board of Trustees v. Keene State College v. Sweeny,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

(8) In *Moore v. City of Charlotte,* 754 F.2d 1100 (4th Cir.1985), the Fourth Circuit Court of Appeals set out the specific proof scheme for cases involving an alleged discriminatory disciplinary decision.

> The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishment imposed. The purpose of the *prima facie* requirement is therefore served and the requirement met upon a showing (1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.

*Id.* at 1105–06.

■ (9) Under either the *McDonnell-Douglas* or the *Moore* proof of scheme, Crawford has not established a *prima facie* case because he has not shown by a preponderance of the evidence that, despite his qualifications, he was discriminated against by the Board's disciplinary measures or that he engaged in prohibited conduct similar to that of a person of another race or sex but the disciplinary measures enforced against Crawford were more severe than enforced against the other person. The evidence in the case revealed that Crawford's performance as a teacher's aid was seriously put into question after he made a sexual advance towards Frazier and explained that his actions were directed by a voice in his mind and that he was in a semi-conscious dream. Owens had received complaints before from female teachers of Crawford's sexual stares and had warned Crawford to refrain from such conduct. In light of Crawford's behavior, it was only prudent that Owens require Crawford to seek psychiatric help and, further, that Flora require Crawford to undergo psychiatric examination. Without some assurance of Crawford's mental competence to perform his job as a teacher's aid

in an elementary school, the Board would have been acting irresponsibly as the corporate body designed to run the Mecklenburg County school system.

(10) The Board's action was precipitated by the question of Crawford's qualifications and was certainly not too severe for the nature of Crawford's offenses. Crawford's evidence does not even hint otherwise.

■ (11) Even if Crawford established a *prima facie* case of discrimination, the Court concludes that the Board offered substantial evidence that its disciplinary action towards Crawford was based upon legitimate, nondiscriminatory considerations. The Board not only articulated its reasons for requiring Crawford to undergo psychological assistance and psychiatric examination but also showed by a preponderance of the evidence, to which Crawford conceded, that Crawford chose to resign rather than follow the recommended action. On this point, the Court need only determine that the Board believed in good faith that Crawford's performance was unsatisfactory and that the asserted reason for the disciplinary decision was not a mere pretext for discrimination. *Moore v. Sears Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982); *Bostic v. Wall,* 588 F.Supp. 994, 1002 (W.D.N.C.1984), *aff'd,* 762 F.2d 997 (4th Cir.1985). The Court concludes that Crawford failed to show by a preponderance of the evidence that the Board's reasons for disciplinary action were a pretext for race and/or sex discrimination.

(12) Consequently, the Court concludes that Crawford should not prevail on any of his claims for the above-stated reasons.

(13) A Judgment dismissing Crawford's action with prejudice will be filed simultaneously with this Memorandum of Decision.

(14) Any finding of fact which is deemed a conclusion of law is so deemed and any conclusion of law which is deemed a finding of fact will be so deemed.